IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| M4 RE, LLC and<br>Gregory A Marx, Jr., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 25 C 12537 |
| | ) | |
| | ) | |
| Artisan Capital Group, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Memorandum Opinion and Order

M4 RE, LLC ("M4") is a consultancy of which Gregory Marx is the sole owner and employee. Marx performed consulting services for Artisan Capital Group, LLC ("Artisan"), for which he appears to have been compensated according to their agreements. Nevertheless, he and M4 sued for breach of contract. Pending is Artisan's motion to dismiss. I grant that motion.

1

**I.**

As far as I can ascertain them, the facts are as follows.[1] Marx operates a Florida consulting firm, M4, in which he is the only consultant. Artisan is an Illinois private equity firm. Artisan contracted with Marx and M4 to "provide acquisition, origination, and asset management consulting services," which appears to mean that they were to help set up real estate deals. ECF 1 at 2.

The parties' consulting contract provided that plaintiffs' compensation would be governed by "deferred equity agreements" ("DEAs"), one of which would be drawn up for each real-estate deal that plaintiffs arranged. *See* ECF 1-1. Two of these DEAs are attached to the complaint. ECF 1-2 & ECF 1-3. Under each of the DEAs, Artisan was to compensate plaintiffs by paying them 30% of Artisan's promoted interest in each deal.[2] Plaintiffs' right to

---

[1] For the purposes of the pending Rule 12(b)(6) motion, I take the plaintiff's facts as true.

[2] In private equity, limited partners invest in a fund. A general partner manages the fund (here, that would be Artisan). When there is a return on the fund, it is distributed to the limited partners in accordance with the size of their investments. Before that distribution, however, the managing partner, in addition to its management fee, receives "carried interest" or "promoted interest" or "promote" or any number of other terms, all of which refer to a flat percentage paid off the top of the return on the fund. "Carried Interest," Commercial Real Estate Developer's Association (formerly known as the National Association of Industrial and Office Properties) (last visited Feb. 13, 2026),

2

half of their payment would vest at closing, another 30% would vest a year after closing, and the remaining 20% would vest a year after that. Each DEA provided that "[u]pon voluntary...termination of the Consultant's services with [Artisan]...all unvested Deferred Equity Awards shall be forfeited." ECF 1-2 at 3; ECF 1-3 at 3.

Plaintiffs assisted Artisan in closing at least three real estate transactions, which they refer to as "College Town Oxford," "2700 Lincoln," and "The Foundry." ECF 1 at 3. This much is clear. The remainder of plaintiffs' facts (and how they relate to theories of contract or equity) are not. Plaintiffs appear to complain of two specific contractual irregularities, along with a few vague references to bad faith dealing.

The first contractual issue resists summary, and I reproduce the text from the complaint verbatim:

> 11. Tellingly, the DEAs were not consistently complied with by Defendant. For example, the DEA was never updated by Defendants and, instead, were delivered to Marx following the Closing of at least the following transactions: College Town Oxford ("CTO"), 2700 Lincoln, and The Foundry, despite being required to do so by Section 4 of the DEA.
>
> 12. Notwithstanding Defendants' breaches, Plaintiffs performed all services required under the agreements and delivered substantial value to Defendant, including the

---

https://www.naiop.org/advocacy/additional-legislative-issues/carried-interest/.

> origination and closure of projects such as the CTO, The Foundry, and 2700 Lincoln, among others.

ECF 1 at 3. It is possible that paragraph 11 is mis-written, and that it means to say that DEAs "were [*not*] delivered to Marx" following certain deals. Alternatively, given that Section 4 of both of the DEAs attached to the complaint calls for the delivery of deal-related records, paragraph 11 may have been meant to allege that "[those records] were [not] delivered to Marx" following certain deals.[3] Either reading would be guesswork.[4] Plaintiffs do

---

[3] Section 4, itself somewhat confusingly drafted, reads (this section is identical across both attached DEAs):

**Record of Eligible Deferred Equity Awards**

Upon closing of a Qualifying Deal, the name of the investing entity, closing date, promote percentage, and vesting dates shall be entered on the Record of Deferred Equity Awards Exhibit which will be maintained by the Company and the Consultant. This section does not apply on Qualifying Deals, whereas the Consultant is a member and has compensation terms written into the investment's partnership agreement of which will be mutually agreed upon by the Company and Consultant.

ECF 1-2 at 3; ECF 1-3 at 3.

[4] Plaintiffs' response to the motion to dismiss contains the following language, which does not much clarify their complaint:

"Plaintiffs allege that Defendant did not 'consistently comply' with the DEAs [and] failed to update and deliver DEAs in the manner required." ECF 12 at 5.

not specify what harm they suffered as a result of whatever is alleged in paragraphs 11–12.

Plaintiffs' second grievance has to do with the timing of payments relating to the College Town Oxford transaction. As above, it is difficult to reduce this part of the complaint to paraphrase without speculating as to what it means, and so I reproduce it verbatim:

13. Throughout their course of dealing, Defendant previously agreed to and paid out the full deferred equity award on prior deals at Closing, contrary to a strict vesting protocol.

14. The [College Town Oxford] was acquired on April 30, 2024, and closed on June 10, 2025,[5] yet Defendant refused to pay the remaining portion of the compensation (*i.e.*, the balance of the 30% promote) by claiming only a partial vesting had occurred due to Defendant's deliberate and voluntary efforts designed to avoid the two-year vesting date.

15. Plaintiffs initiated several discussions with Defendant regarding the prior breaches, and the demonstrable lack of good faith. For example, during such a discussion on September 4, 2024, Defendant attempted to re-negotiate the terms and structure of the DEA whereby Plaintiffs would be compensated on a deal-by-deal basis.

16. Marx and M4 were willing to renegotiate in good faith but Defendants refused to do so, raising further alarm amongst Marx and M4.

---

[5] Artisan says that the actual date was June 10, 2024, and that the 2025 date was a scrivener's error. ECF 4 at 4 n.1. This seems to be correct, given the rest of plaintiffs' complaint.

17. On September 19, 2024, Marx asked for an updated agreement consistent with the terms or the governing DEA. While Defendant acknowledged receipt and was promised an updated agreement within "the next few days," Defendants provided nothing.

18. Further compensation disputes exist regarding The Foundry, 2700 Lincoln, and a "hold-back" payment relating to the CTO deal, with damages currently exceeding $1,062,744.

19. After it was apparent that Defendant was not proceeding in good faith and had already materially breached the agreement and would not even re-negotiate the terms of the DEA in good faith, Marx and M4 voluntarily terminated its engagement effective December 3, 2024, approximately 4 months prior to the next vesting date.[6]

ECF 1 at 3-4. Plaintiffs' response to the motion to dismiss interprets this part of the complaint as making out the following: "Plaintiffs allege that Defendant...departed from the written vesting schedule by paying the full deferred equity at closing in prior deals; refused to pay the balance of the 30% promote on CTO; and repeatedly acted in bad faith, including by attempting to re-negotiate on unfavorable terms and then failing to provide promised updated agreements." ECF 12 at 5.

I take all this together to mean that (1) Artisan had paid plaintiffs early in prior deals; (2) Artisan did not pay plaintiffs early at the closing of the College Town Oxford deal but instead

---

[6] As Artisan notes, this would be approximately six, not four, months from the next vesting date, in June 2025.

according to the vesting schedule in the DEA; (3) when plaintiffs complained, Artisan declined to renegotiate the schedule in the contract; and (4) plaintiffs, after that refusal, affirmatively terminated their relationship with Artisan.

As for the "[f]urther compensation disputes [that] exist regarding The Foundry, 2700 Lincoln, and a 'hold-back' payment relating to the CTO deal, with damages currently exceeding $1,062,744," there is nothing in any filing enlightening me as to what those disputes are, what a "hold-back" payment is, or where the million-dollar figure emerges from. ECF 1 at 4.

On those facts, plaintiffs have sued for breach of contract (Count I), promissory estoppel (Count II), quantum meruit (Count III), and unjust enrichment (Count IV).

## II.

Under Rule 8(a)(2), a complaint must contain a "short and plain statement of the claim showing the pleader is entitled to relief." To survive a motion to dismiss under Rule 12(b)(6), complaints need not contain detailed factual allegations, but they must contain more than mere "labels and conclusions," or "formulaic recitation[s] of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555 (2007). "After excising" legal conclusions and conclusory allegations, I must "determine whether the remaining factual allegations plausibly suggest an entitlement

to relief." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citations omitted). "Making the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). When deciding a Rule 12(b)(6) motion, I can consider the pleadings and any written instruments attached to them as exhibits. *Northern Indiana Gun & Outdoors Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452-53 (7th Cir. 1998). Where "documents attached to a complaint contradict the allegations of the complaint, the document controls" in the Rule 12(b)(6) context. *Id.* at 454.

### III.

### A. Breach of Contract

Artisan sorts plaintiffs' allegations into two buckets: (1) everything having to do with anything other than the College Town Oxford payments; and (2) the "late" payments on the College Town Oxford deal. As to the first bucket, Artisan argues that plaintiffs' allegations are too vague make out a claim. As to the second, Artisan argues that plaintiffs have pled themselves out of court. I agree on both fronts.

### 1. The Non-College Town Oxford Allegations

"[I]n alleging a breach of contract, a plaintiff's pleadings must allege facts sufficient to indicate the terms of the contract

claimed to have been breached." *Elson v. State Farm Fire & Cas. Co.*, 691 N.E.2d 807, 811 (Ill. App. Ct. 1998). That is, the plaintiffs have to identify which parts of what contract are at issue. *Loup Logistics Co. v. Windstar, Inc.*, 2018 WL 5619454, *1, *2 (N.D. Ill. Oct. 30, 2018). They have not done so here.

Plaintiffs write that "the DEA was never updated by Defendants" but do not specify how it should have been updated or which DEA they are referring to. ECF 1 at 3. They write that DEAs "were delivered to Marx following the Closing" of three transactions, "despite being required to do so by Section 4 of the DEA." *Id.* Presumably they mean that the DEAs "were [*not*] delivered," but even that does not make the allegation sensical, because Section 4 of the DEAs required the delivery not of more DEAs but of records related to each real estate transaction. And even if they meant to allege that "[those records] were [not] delivered," those very records appear to be attached to the DEAs that plaintiffs have attached to their complaint. *See* ECF 1-2 at 3, 6; ECF 1-3 at 3, 6-9.

Plaintiffs also write that "[f]urther compensation disputes exist" regarding various deals, including "a 'hold-back' payment relating to the [College Town Oxford] deal" but give me nothing else to work with. ECF 1 at 4. Insofar as plaintiffs are

complaining of anything other than the timing of the College Town Oxford payments, they have failed to state a claim.

### 2. The College Town Oxford Allegation

As to the payments on the College Town Oxford deal, Artisan argues that plaintiffs have pled facts which make out compliance with the parties' contracts, rather than breach. Plaintiffs attached the DEA which governed payment for the College Town Oxford deal. That DEA provided a schedule of payments in which plaintiffs' rights to portions of their compensation would not vest until one and then two years after closing. The DEA also provided that plaintiffs would forfeit any future payments if they terminated their relationship with Artisan. Artisan's alleged "breach" of the DEA was in failing to pay plaintiffs' their full compensation at closing. Artisan argues that, because the contract did not require full payment at closing and because plaintiffs forfeited any future payments by terminating their agreement, plaintiffs have pled compliance, rather than breach. I agree.

The elements of a breach of contract claim in Illinois are: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (citations omitted). Where litigants are parties to a written contract, my analysis

10

begins "with the language of the contract itself." *Emergency Med. Care, Inc. v. Marion Mem'l Hosp.*, 94 F.3d 1059, 1060–61 (7th Cir. 1996). "If the language unambiguously answers the question at issue, the inquiry is over...[and] the intent of the parties must be determined solely from the contract's plain language, and extrinsic evidence outside the 'four corners' of the document may not be considered." *Much v. Pacific Life Mut. Life Ins. Co.*, 266 F.3d 637, 643 (7th Cir. 2001).

The contract at issue is the second DEA attached to plaintiffs' complaint. ECF 1-3. Under that contract, plaintiffs' right to 30% of their compensation would not vest until one year after the closing date of any deal they arranged, and the final 20% would not vest until two years after closing. *Id.* at 3. The DEA specifies that if the plaintiffs were to voluntarily terminate their relationship with Artisan, "all unvested Deferred Equity Awards shall be forfeited. No payment shall be made with respect to forfeited Deferred Equity Awards." *Id.* These contract terms are unambiguous. So are, despite the shortcomings of the complaint, the facts: plaintiffs were, as the contract specifies, only paid 50% of their compensation at closing on the College Town Oxford deal in June 2024. ECF 1 at 3. The plaintiffs then "voluntarily terminated [their] engagement [with Artisan] effective December 3, 2024," after which they received no further payments, also as the

contract specified. *Id.* at 4. By the plain terms of the contract, there was no breach here.

Plaintiffs argue in their response that under the "'first material breach' doctrine, a party that materially breaches a contract generally cannot enforce the contract's benefits or forfeiture provisions against the non-breaching party." ECF 12 at 5. Plaintiffs cite *Firestone Financial Corp. v. Meyer*, 796 F.3d 822 (7th Cir. 2015. *Firestone* does not support that proposition. It does not deal with what it calls a "prior-breach-of-contract defense" at all; instead, it declines to explore the concept. *Id.* at 828. It is true that a party who has materially breached a contract cannot then, when the other party ceases to perform in response, sue that other party for breach. 23 Williston on Contracts (4th ed.) § 63:8 (Consequences of breach). But this principle does not help plaintiffs to victory.

Plaintiffs *seem* to be arguing that, because Artisan had paid them early in the past, I should rewrite the contract such that they were always owed early payment, meaning that Artisan's failure to pay early became a material breach, such that their voluntary termination of relations with Artisan would not result in forfeit of future payments (and, depending on how the complaint is interpreted, would cause them to prevail on other claims).

One problem with this argument is that plaintiffs point me to no authority supporting the proposition that I should use an insinuated-but-not-actually-alleged course of dealing in past contracts to rewrite the terms of an instant one. Another is that doing so here would make no sense. One of the few things the complaint clarifies is that each deal came with its own DEA. If plaintiffs had been paid early in past deals and had enjoyed that, they should not have then signed a *new* DEA in which they specifically agreed *not* to be paid early.

Plaintiffs have not made out a claim for breach of contract.

### B. The Remainder

As to the plaintiffs' purported claims in Counts II–IV, Artisan argues that the presence of a valid contract cuts off the availability of equitable and quasi-contract claims.

In Count II, plaintiffs assert promissory estoppel, writing that "Defendant made clear, definite promises regarding Plaintiffs' compensation including full vesting at certain milestones and as reflected in prior course of dealing." ECF 1 at 5. To make out a promissory estoppel claim, a plaintiff must show: "1) the defendant made an unambiguous promise to the plaintiff; 2) the plaintiff relied on the promise; 3) the plaintiff's reliance was expected and foreseeable by the defendant; and 4) the plaintiff relied on the promise to her detriment." *Czerska v. United*

*Airlines, Inc.*, 292 F. Supp. 2d 1102, 1120 (N.D. Ill. 2003) (citing *Pokora v. Warehouse Direct, Inc.*, 751 N.E.2d 1204, 1212 (Ill. App. Ct. 2001)). Plaintiffs fail to make out an unambiguous promise of early payment—as I noted just now, the DEA they agreed to after any "prior course of dealing" promised the opposite. Likewise, while a party may plead breach and promissory estoppel in the alternative, where an enforceable contract exists, "the party may not recover under the promissory estoppel theory." *Id.* (citing *Prentice v. UDC Advisory Servs., Inc.*, 648 N.E.2d 146, 150 (Ill. Ct. App. 1995)). Here, an enforceable contract exists. The plaintiffs have not stated a claim for promissory estoppel.

The existence of a valid contract likewise precludes remedies, like unjust enrichment and quantum meruit,[7] which sound in quasi-contract. *Util Audit, Inc. v. Horace Mann Serv. Corp.*, 383 F.3d 683, 688–89 (7th Cir. 2004) ("When two parties' relationship is governed by contract, they may not bring a claim of unjust enrichment unless the claim falls outside the contract."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) ("[I]n Illinois, quasi-contractual

---

[7] In quasi-contract, unjust enrichment focuses on the benefit *received* by the defendant, whereas quantum meruit focuses on what the plaintiff *expended* in cash, labor, etc. *See Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990).

14

relief is available only where there is no express contract between the parties.") . There is a valid contract here, which plaintiffs attached to their complaint. Plaintiffs have failed to state a claim at Counts III or IV.

I dismiss Counts I-IV. As this is the first dismissal, plaintiffs may file a first amended complaint within thirty days, to the extent that they can do so consistent with Federal Rule of Civil Procedure 11. If plaintiffs do not file a first amended complaint within thirty days, the complaint will be dismissed with prejudice.

### C. Attorney's Fees

What I have not yet mentioned is that, in their response to the motion to dismiss, plaintiffs moved for sanctions. This was on the basis that Artisan's motion (which I have just granted) "crosses the line from a good-faith attempt to test the sufficiency of the pleading" into frivolity and "could only have been filed for an improper purpose such as harassment, annoyance, or to needlessly increase the costs of this otherwise straightforward" dispute. ECF 12 at 10. Plaintiffs request that Artisan be made to reimburse them for the attorney's fees they expended in responding to the motion to dismiss. Artisan has also asked for fees.

Unsurprisingly, besides that it points the finger in the wrong direction, plaintiffs' motion for sanctions is improper under Rule

15

11(c)(2). It is denied. Artisan, for its part, has identified no statute authorizing a departure from the rule that litigants bear their own attorney's fees. *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247–48 (1975) (surveying the history of the 'American Rule'). Artisan's general request for fees is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 30, 2026

16